AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California



LODGED
CLERK, U.S. DISTRICT COURT

6/2/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ GD ___ DEPUTY

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No.   2:22-mj-02176-DUTY |
| JASON COLEMAN, | |
| Defendant(s) | |

FILED
CLERK, U.S. DISTRICT COURT

June 2, 2022

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ ch ___ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of May 19, 2022, in the county of Los Angeles in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of Ammunition |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
*Complainant's signature*

Special Agent Bryan Traverso
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:          June 2, 2022

*Judge's signature*

City and state:   Los Angeles, California          Hon. Paul Abrams U.S. Magistrate Judge
*Printed name and title*

AUSA: Morgan J. Cohen (x2848)

### <u>AFFIDAVIT</u>

I, Bryan Traverso, being duly sworn, declare and state as follows:

### I.  <u>PURPOSE OF AFFIDAVIT</u>

1.    This affidavit is made in support of a criminal complaint and arrest warrant against JASON COLEMAN ("COLEMAN") for a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm.

2.    This affidavit is also made in support of an application for a warrant to search the following digital devices (the "SUBJECT DEVICES"), in the custody of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") in Santa Maria, California, as described more fully in Attachment A:

        a.    One Samsung Galaxy cellphone bearing IMEI number 350207638600798 ("SUBJECT DEVICE 1");

        b.    One Apple iPad ("SUBJECT DEVICE 2");

        c.    One Motorola cell phone ("SUBJECT DEVICE 3");

        d.    One Dell laptop ("SUBJECT DEVICE 4");

        e.    One Google Pixelbook ("SUBJECT DEVICE 5");

        f.    One Samsung cellphone with multiple SIM cards ("SUBJECT DEVICE 6");

        g.    One blue Apple iPhone ("SUBJECT DEVICE 7");

        h.    One Samsung cellphone bearing IMEI number 350207634694548 ("SUBJECT DEVICE 8");

        i.    One Samsung cellphone bearing IMEI number 352082500227691 ("SUBJECT DEVICE 9"); and

        j.    One silver LG cellphone ("SUBJECT DEVICE 10").

3.     The requested search warrant seeks authorization to
seize evidence, fruits, or instrumentalities of violations of
Title 18, United States Code, Section 922(g) (Felon in
Possession of a Firearm); Section 924(c) (Possession of a
Firearm in Furtherance of a Drug Trafficking Crime); Title 26,
United States Code, Section 5861(d) (Possession of an
Unregistered Machinegun); and Title 21, United States Code,
Sections 841(a)(1) (Possession with Intent to Distribute
Controlled Substances) and 846 (Conspiracy to Possession with
Intent to Distribute Controlled Substances) (the "Subject
Offenses"), as described more fully in Attachment B.
Attachments A and B are incorporated herein by reference.

4.     The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint, arrest
warrant, and search warrant, and does not purport to set forth
all of my knowledge of or investigation into this matter.
Unless specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

## I.  BACKGROUND ON SPECIAL AGENT BRYAN TRAVERSO

5.     I am employed by ATF as a Special Agent and have been
so employed for 17 years.  I was hired by ATF in February 2005
and attended the ATF Academy from March through September 2005,
where I received approximately 1,000 hours of formal training on

conducting firearms, explosives, arson, drug-trafficking, and gang investigations.  I am currently assigned to the ATF Los Angeles Field Division and am responsible for investigating violations of federal arson, explosives, and firearms laws and regulations.  I regularly refer to these laws and regulations during the course of my official duties.  I also currently serve as an ATF Interstate Nexus Expert.

6.    I have debriefed multiple informants and witnesses who had personal knowledge regarding illegal firearms and drug trafficking.  Additionally, I have participated in many aspects of gang, firearms, and drug investigations, including undercover operations, arrests, and surveillance.  I am familiar with firearms and drug traffickers' methods of operation, including the distribution, storage, and transportation of drugs, as well as the collection of money proceeds of drug-trafficking and money-laundering methods used to conceal the nature of the proceeds.  I have participated in multiple investigations involving violent drug-trafficking organizations and large-scale street gangs, including those that have involved the court-authorized interception of wire and electronic communications. In addition, I have participated in investigations that have resulted in the seizure of multi-pound quantities of methamphetamine.  I am also familiar with methods used by gang members to manufacture drugs, smuggle and safeguard drugs, distribute drugs, and collect and launder proceeds related to the sales of drugs.  I am familiar with the methods employed by gang members to thwart detection by law enforcement including

3

the use of cellular telephone technology, counter-surveillance techniques, false or fictitious identities and addresses, money-laundering techniques, and coded language.

## II. <u>SUMMARY OF PROBABLE CAUSE</u>

7.    On May 19, 2022, Santa Barbara Sheriff's Office ("SBSO") deputies pulled over a car driven by a man later determined to be COLEMAN, a felon who previously sustained two convictions for being a felon in possession of a firearm. Because the car's registration had expired and COLEMAN did not have a valid driver's license, the deputies arranged to have the car towed.  The deputies proceeded to inventory the items in the car, and asked COLEMAN if there were any firearms in the car. COLEMAN stated that there was a rifle in the trunk, which the deputies recovered.  The deputies arrested COLEMAN for, among other offenses, being a felon in possession of a firearm.  Upon searching COLEMAN incident to his arrest, the deputies discovered a loaded handgun in his waistband and five rounds of ammunition in his pocket.  The deputies subsequently searched the car and discovered a Tommy-gun-style automatic firearm, hundreds of rounds of ammunition of various calibers, body armor, approximately 23 pounds of a substance believed to be marijuana, as well as smaller quantities of substances believed to be heroin, methamphetamine, fentanyl, and cocaine.

8.    Also on May 20, 2022, SBSO detectives and deputies executed state search warrants for COLEMAN's home, the car, and a second car parked in front of COLEMAN's home.  Inside COLEMAN's home, SBSO deputies discovered, among other items,

approximately 89 grams of a substance that field tested positive for methamphetamine; approximately 10 pounds of a substance believed to be marijuana; 20 rounds of ammunition of various calibers; and SUBJECT DEVICES 1-6.  Inside one of COLEMAN's cars, an SBSO detective discovered SUBJECT DEVICES 7-10, as well as a Tommy-gun magazine loaded with 31 rounds of .45 caliber ammunition.  Inside another of COLEMAN's cars, SBSO deputies discovered a disassembled Raven Model MP-25 .25 caliber automatic handgun, two AK-47 extended magazines loaded with 7.62 caliber ammunition, two soft ballistic body armor vests, a cardboard box containing Tannerite binary explosive mix, a backpack containing, among other things, a small container of Tannerite pellets, and multiple rounds of ammunition of various calibers.

### III.  STATEMENT OF PROBABLE CAUSE

9.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.   Officers Discover Three Firearms, Hundreds of Rounds of Ammunition, and Several Suspected Controlled Substances Inside COLEMAN's Car Following a Traffic Stop**

10.   Based on my review of SBSO reports and conversations with SBSO detectives and deputies, I know the following:

11.   On May 19, 2022, SBSO Deputies Garcia and Martinez were conducting uniformed patrol in their patrol car in Santa Ynez, California, when they noticed a white 2002 Toyota Avalon bearing California license plate number 7XBF235 (the "Avalon")

driving eastbound on Sanja Cota Avenue.  Deputy Garcia asked
SBSO Dispatch to conduct a records check on the Avalon's license
plate, which revealed that the Avalon's registration had expired
on August 26, 2020.

12.  Deputy Garcia subsequently asked SBSO Dispatch to
conduct a records check on the Avalon's registered driver, who
was listed as COLEMAN.  SBSO Dispatch informed Deputy Garcia
that COLEMAN had a suspended license and a criminal history that
included being a felon in possession of a firearm.

13.  After learning this information, Deputies Garcia and
Martinez initiated a traffic stop of the Avalon based on its
expired registration in violation of California Vehicle Code
Section 4000(a).  The Avalon yielded.  While approaching the
Avalon, Deputy Garcia noticed that the Avalon bore a 2023
registration sticker.  Because Deputy Garcia knew that the
Avalon's registration had expired, he suspected that the 2023
registration sticker was fraudulent, in violation of California
Vehicle Code Section 4462.5.

14.  Deputy Martinez made contact with the Avalon's driver
and passenger and advised them of the purpose of the traffic
stop.  Deputy Martinez asked the driver for his driver's
license, which the driver provided.  Based on the driver's
license, Deputies Garcia and Martinez identified COLEMAN as the
driver of the Avalon.  The passenger verbally identified herself
as E.G.

15.  Upon identifying COLEMAN and E.G., Deputy Martinez
asked COLEMAN for the Avalon's registration.  COLEMAN was unable

to provide the registration and stated that it was because the
Avalon had been parked for several years while COLEMAN was
living in Oregon.  COLEMAN then told Deputy Garcia that he was
planning on having the Avalon towed back to his home.  When
Deputy Garcia asked COLEMAN why he was planning to do this,
COLEMAN stated that it was because he was unsure of the status
of his driver's license.

16.  Because COLEMAN could not provide a valid registration
for the Avalon and because the Avalon bore a fraudulent
registration sticker, Deputy Garcia initiated a tow request for
the Avalon.  Deputy Garcia advised COLEMAN that the Avalon would
be towed and that he would be conducting an inventory of items
of value inside the Avalon to protect COLEMAN, the tow company,
and the SBSO.

17.  During the inventory, Deputy Garcia asked COLEMAN if
there were any firearms inside in the Avalon.  COLEMAN paused,
as if he were thinking about how to respond, and then stated
that there were no firearms inside the Avalon; he then stated
that there was a rifle in the trunk.  Upon learning of the
rifle, Deputy Garcia requested backup.  While waiting for backup
to arrive, Deputy Garcia asked COLEMAN what type of firearm was
in the trunk.  COLEMAN stated that it was a hunting rifle.

18.  Shortly thereafter, SBSO Senior Deputy Alvidres
arrived at the traffic stop.  Senior Deputy Alvidres escorted
COLEMAN from the AVALON and conducted a pat down search, which
did not reveal any weapons.  The other two deputies escorted
E.G. from the Avalon and, because there was no female deputy

present, conducted a visual scan, which did not reveal any weapons.

19.  Once COLEMAN and E.G. were secured, Deputy Garcia unsuccessfully attempted to open the Avalon's trunk, at which time COLEMAN told him that the trunk could only be opened with the Avalon's ignition key.  Deputy Garcia used the key to open the trunk and found a gray elongated rifle sock.  Deputy Garcia removed this item and brought it back to his patrol car.  Deputy Garcia removed the rifle sock, which revealed a Norinco Model SKS 7.62x39mm rifle, bearing serial number 16324.

20.  After Deputy Garcia discovered the rifle, Deputy Martinez read E.G her Miranda rights.  E.G. verbally indicated she understood her rights and began speaking with Deputies Garcia and Martinez.  During the interview, E.G. stated the rifle was hers and that she had nothing else to say.  Deputy Martinez then ended the interview with E.G.

21.  After speaking with E.G., Deputies Garcia and Martinez interviewed COLEMAN.  Prior to the interview, Deputy Martinez read COLEMAN his Miranda rights.  COLEMAN indicated that he understood his rights and began speaking with Deputy Garcia. COLEMAN stated that he knew nothing about the Avalon's registration sticker.  COLEMAN further stated that he knew the rifle was inside the Avalon but did not believe he personally possessed the rifle.  COLEMAN also stated that the rifle was inside the Avalon because he and E.G. were going camping.

22.  Deputies Garcia and Martinez arrested COLEMAN for violations of California Penal Code Section 29800(a)(1): Felon

in Possession of a Firearm, California Penal Code Section 30510(a)(11): Possession of an Assault Weapon, California Vehicle Code Section 4462.5: False Display of Registration, and California Vehicle Code Section 12500(a): Driving Without a License.

23.   Deputies Garcia and Martinez then searched COLEMAN incident to arrest.  In COLEMAN's waistline area, the deputies discovered a Kimber Model Micro 9 9mm pistol, bearing serial number PB0275954 (the "Kimber pistol") loaded with six rounds of ammunition in the magazine and one round of ammunition in the chamber.  In COLEMAN's left front pocket, the deputies discovered five rounds of assorted ammunition, as well as a plastic baggie containing approximately 13.06 grams of a substance that Deputy Garcia, based on his training and experience, suspected of being cocaine.

24.   The SBSO deputies then searched the Avalon and discovered several large plastic bags inside the trunk that were determined to contain approximately 32 pounds of a substance believed to be marijuana.  Then deputies also discovered two Stanley tool bags inside the trunk, which contained, among other items, more than 200 rounds of ammunition of various calibers, a title to the Avalon that listed COLEMAN as the owner, and mail addressed to COLEMAN.  Also inside the trunk, the deputies discovered a black hardcase that contained several firearm components.

25.   The SBSO deputies then search the backseat of the Avalon and discovered GH Armor Systems level 3-A body armor, as

9

well as a black bag.  Inside the black bag, which was located
directly behind the front driver's seat, the deputies discovered
one Tommy-gun-style, .45 caliber semiautomatic rifle made by
Volunteer Inc. and bearing serial number 0414, which was loaded
with 24 rounds of .45 caliber ammunition.

26.  The SBSO deputies then searched the front cabin of the
Avalon and discovered a 12-gauge ammunition casing in the front
driver-side door slot.  Additionally, inside a compartment
located near the arm rest of the front driver-side door, the
deputies discovered a pouch containing approximately 25.54 grams
of a substance believed to be heroin, approximately 16.87 grams
of a substance believed to be cocaine, approximately 2.41 grams
of a substance believed to be methamphetamine, approximately
4.5 grams of suspected counterfeit fentanyl M30 pills, and
several small Ziplock baggies.  Inside the Avalon's center
console, the deputies discovered two methamphetamine pipes with
attached bongs.

27.  The Avalon was towed to a lot in Buellton, California,
by a private tow company.

**B.   Officers Discover 20 Rounds of Ammunition, Suspected
       Methamphetamine, Suspected Marijuana, a Digital Scale,
       and SUBJECT DEVICES 1-6 Inside COLEMAN's Residence,
       and SUBJECT DEVICES 7-10 Inside the Avalon**

28.  Based on my review of SBSO reports, conversations with
SBSO detectives and deputies, and the state search warrant
referenced below, I know the following:

29.  On May 20, 2022, Superior Court Judge Kay Kuns of the
Santa Barbara County Judicial District approved a search warrant

for COLEMAN's home, located on Polaris Avenue in Lompoc, California (the "residence"), as well as the Avalon.  An SBSO detective and deputies executed the warrant that same day.

30.  Inside the residence, the SBSO deputies recovered the following items:

       a.  Two handgun holsters;

       b.  A digital scale;

       c.  Approximately 89 grams of a substance that field tested positive for methamphetamine;

       d.  Approximately 10 pounds of a substance believed to be marijuana;

       e.  20 rounds of ammunition of various calibers; and

       f.  SUBJECT DEVICES 1-6.

31.  S.L., along with other individuals, was present at the residence when SBSO deputies executed the search warrant and verbally consented to a search of her phone.  While reviewing the phone, an SBSO deputy discovered a video of COLEMAN shooting an automatic firearm resembling the Tommy gun discovered in the Avalon on May 19, 2022.

32.  Inside the Avalon – which was searched at the lot in Buellton, California, where it had been towed the night before – an SBSO detective discovered a Tommy-gun magazine loaded with 31 rounds of .45 caliber ammunition.  On the front seat of the Avalon, the detective discovered SUBEJCT DEVICES 7-10.

11

**C.    Officers Discover a Disassembled Automatic Handgun, Body Armor, Ammunition, and Explosive Materials in COLEMAN's Second Car**

33.    Based on my review of SBSO reports, conversations with SBSO detectives and deputies, and the state search warrant referenced below, I know the following:

34.    On May 20, 2022, Superior Court Judge Kay Kuns of the Santa Barbara County Judicial District, approved a search warrant for a vehicle located at the residence, specifically, a 2007 Dodge Ram 2500 bearing license number 8G79222, which is registered to COLEMAN (the "Dodge Ram").

35.    An SBSO detective executed the warrant that same day and discovered the following items, among others, inside the Dodge Ram:

        a.    A disassembled Raven Model MP-25 .25 caliber automatic handgun;

        b.    Two AK-47 extended magazines, loaded with 7.62 caliber ammunition;

        c.    Two soft ballistic body armor vests, one which had a metal rifle plate inserted;

        d.    A cardboard box containing Tannerite binary explosive mix;

        e.    A backpack containing, among other things,  a small container of Tannerite pellets;

        f.    A cardboard box and purchase receipt for the Kimber pistol; and

        g.    Multiple rounds of ammunition of various calibers.

**D.   COLEMAN Has At Least Four Prior Felony Convictions**

36.   On May 31, 2022, I reviewed COLEMAN's criminal history and learned that COLEMAN has previously been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

a.   On February 2, 2002, COLEMAN was convicted of possession of a controlled substance for sale, in violation of California Health and Safety Code Section 11378, in the Superior Court of California, County of Santa Barbara, Case Number 1051892.

b.   On April 29, 2004, COLEMAN was convicted of possession of a controlled substance, in violation of California Penal Code Section 11377(A), in the Superior Court of California, County of Santa Barbara, Case Number 1125675.

c.   On January 11, 2005, COLEMAN was convicted of felon in possession of a firearm, in violation of California Penal Code Section 12021(A)(1), in the Superior Court of California, County of Santa Barbara, Case Number 1151179.

d.   On June 14, 2012, COLEMAN was convicted of felon in possession of a firearm, in violation of California Penal Code Section 12021(A)(1), in the Superior Court of California, County of Santa Barbara, Case Number 1410269.

**E.   The Kimber Pistol Traveled in Interstate Commerce**

37.   I currently serve as an ATF Interstate Nexus Expert.

38.   On May 31, 2022, I examined the Kimber pistol confirmed that it was a Kimber Model Micro 9 9mm pistol, bearing

13

serial number PB0275954. The KIMBER was manufactured by Kimber in New York, outside the state of California.

39. Because the SKS was found in California, I believe that it has traveled in, and affected, interstate commerce.

### IV. TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

40. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.   Persons who possess, purchase, manufacture, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.   Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone

14

calls, e-mail, text message, and social media message to and
from smartphones, laptops, or other digital devices.  This
includes sending photos of the firearm between the seller and
the buyer, as well as negotiation of price.  In my experience,
individuals who engage in street sales of firearms frequently
use phone calls, e-mail, and text messages to communicate with
each other regarding firearms that the sell or offer for sale.
In addition, it is common for individuals engaging in the
unlawful sale of firearms to have photographs of firearms they
or other individuals working with them possess on their cellular
phones and other digital devices as they frequently send these
photos to each other to boast of their firearms possession
and/or to facilitate sales or transfers of firearms.

## V.  <u>TRAINING AND EXPERIENCE ON DRUG OFFENSES</u>

41.  Based on my training and experience and familiarity
with investigations into drug trafficking conducted by other law
enforcement agents, I know the following:

a.  Drug trafficking is a business that involves
numerous co-conspirators, from lower-level dealers to higher-
level suppliers, as well as associates to process, package, and
deliver the drugs and launder the drug proceeds.  Drug
traffickers often travel by car, bus, train, or airplane, both
domestically and to foreign countries, in connection with their
illegal activities in order to meet with co-conspirators,
conduct drug transactions, and transport drugs or drug proceeds.

b.  Drug traffickers often maintain books, receipts,
notes, ledgers, bank records, and other records relating to the

manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

42.  As used herein, the term "digital device" includes the SUBJECT DEVICES.

43.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

        a.    Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

        b.    Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

44. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000

18

average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

45.   The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

a.   Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

c.   The person who is in possession of a device or
has the device among his or her belongings is likely a user of

the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress COLEMAN's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of COLEMAN's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

46.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

## VII. <u>CONCLUSION</u>

47.  For all of the reasons described above, there is probable cause to believe that COLEMAN has committed a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm. There is also probable cause that the items to be seized as described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  2nd  day of
June, 2022.

_____
HONORABLE PAUL ABRAMS
UNITED STATES MAGISTRATE JUDGE